**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**

**JOSHUA FIRMIN**                                       **NO. 25-63**

## ORDER AND REASONS

Before the Court is the government's Motion to Exclude Proposed Expert Testimony of Mr. Paul Duffy.[1] The government moves the Court to issue an order excluding the testimony of Defendant Joshua Firmin's ("Firmin") proposed expert witness, Paul Duffy ("Duffy"), a law enforcement use of force expert.[2] Firmin opposes the motion.[3] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motion.

## I. Background

On March 19, 2025, Firmin was charged by a grand jury in the United States District Court for the Western District of Louisiana with one count of deprivation of rights under color of law and one count of falsification of records.[4] These charges arise out of Firmin's service as a Deputy United States Marshal for the United States Marshals Service.[5] Count 1 of the Indictment alleges

---

[1] Rec. Doc. 53.

[2] *Id.*

[3] Rec. Doc. 62.

[4] Rec. Doc. 1.

[5] *Id.* at 1.

1

that on or about February 29, 2024, Firmin "willfully deprived Victim 1, a federal prisoner, of the right, secured and protected by the Constitution and laws of the United States to be free from cruel and unusual punishment" by physically assaulting Victim 1 without legal justification.[6]

Count 2 of the Indictment alleges that on or about February 29, 2024, Firmin knowingly falsified and made a false entry in a record and document, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Department of Justice Office of Inspector General.[7] Specifically, Count 2 alleges that Firmin:

> wrote a narrative report as part of a United States Marshals Service Field Operational Report regarding a use of force against Victim 1, in which he falsely states (1) that Victim 1 had attempted to spit on Firmin, and (2) that Victim 1's head struck a cell door when Victim 1 "jerked" while being escorted by Firmin. In fact, as Firmin then well knew, (1) Victim 1 had not attempted to spit on Firmin, and (2) Victim 1's head had struck a wall when Firmin pushed him forcefully against it.[8]

This matter is scheduled for a jury trial to begin on April 13, 2026.[9] In advance of trial, the defense disclosed Duffy's expert witness report to the government.[10] Duffy's report states that he served with the United States Marshals Service ("USMS") for 24 years, retiring as a Senior Inspector in March 2019.[11] Prior to his retirement, Duffy was assigned to the Office of Professional Responsibility as an Internal Affairs Investigator and to various positions with the Training Division.[12] After his retirement, Duffy served as a District Security Officer, a contract position

---

[6] *Id.*

[7] *Id.* at 2.

[8] *Id.*

[9] Rec. Doc. 37.

[10] Rec. Doc. 53-1.

[11] *Id.* at 3.

[12] *Id.*

2

with the USMS, in the Southern District of Georgia and Northern District of Florida for six years.[13] Duffy holds several instructor certifications from the Federal Law Enforcement Training Center and has completed the Force Science Institute's forensic science training and exam requirements.[14]

Duffy's report discloses two main opinions. First, Duffy opines that Victim 1 "posed an imminent physical threat" to Firmin and others at the time of the alleged offense.[15] Second, Duffy opines that Firmin "utilized reasonable force in removing [Victim 1] from the original cell to another in response to [Victim 1]'s threats."[16]

On March 13, 2026, the government filed the instant Motion to Exclude Proposed Expert Testimony of Mr. Paul Duffy.[17] On March 27, 2026, Firmin filed an opposition to the motion.[18] On April 1, 2026, the government filed a reply brief in further support of the motion.[19] On April 9, 2026, the Court held a hearing on the motion. With the consent of the parties, the hearing was conducted by videoconference, and Firmin waived any right to an in-person appearance under Federal Rule of Criminal Procedure 43.

---

[13] *Id.* at 4.

[14] *Id.*

[15] *Id.* at 9.

[16] *Id.* at 12.

[17] Rec. Doc. 53.

[18] Rec. Doc. 62.

[19] Rec. Doc. 69.

## II. Parties' Arguments

### A.    *The Government's Arguments in Support of the Motion*

The government moves the Court to issue an order excluding Duffy's proposed testimony.[20] The government raises four arguments in support of this motion.[21]

First, the government asserts Duffy should not be permitted to testify that Victim 1 posed an imminent physical threat to Firmin.[22] The government argues that this opinion is unhelpful and unreliable.[23] The government contends that the opinion is unhelpful because the issue of whether Victim 1 posed an imminent physical threat to Firmin is a matter of common sense.[24] The government submits that the facts of this case do not present the kind of uncommon or specialized technical law enforcement considerations that a jury needs expert help to understand.[25] Additionally, the government argues that Duffy's opinion on whether Victim 1 posed a threat to Firmin is not based on a reliable expert methodology.[26] According to the government, reliable use of force analysis requires identification of the governing legal standard and careful inclusion or exclusion of facts based on that standard.[27] The government argues that Duffy's analysis does not follow these basic logical principles because he does not identify the controlling legal standard or

---

[20] Rec. Doc. 58.

[21] *Id.*

[22] *Id.* at 11.

[23] *Id.*

[24] *Id.* at 12.

[25] *Id.* at 14.

[26] *Id.*

[27] *Id.* at 14–15.

confine the analysis "to the facts that could logically be probative of [] Firmin's state of mind during his use of force against Victim 1."[28]

Second, the government contends Duffy should not be permitted to testify that Firmin used reasonable force.[29] The government argues that Opinion 2 is not the product of accepted and reliable analytical methods because Duffy did not follow the *Hudson v. McMillian*[30] framework for analyzing whether use of force against a convicted prisoner serving a sentence violates the Eighth Amendment.[31] Additionally, the government asserts that Opinion 2 should be excluded under Rule 403 because Duffy analyzed the facts under a nonspecific and inapplicable standard, and the opinion's probative value is greatly outweighed by its danger of confusing issues and misleading the jury.[32]

Third, the government contends that specific inadmissible facts, claims, and statements should be excluded.[33] The government submits that Duffy should be prohibited from testifying as to Firmin's intent or the severity of Victim 1's injuries.[34] Furthermore, the government asserts that Duffy should be prohibited from disclosing inadmissible hearsay to the jury, such as the transport officers' accounts of statements by Victim 1 and Firmin's post-incident statement to his

---

[28] *Id.* at 15.

[29] *Id.* at 18.

[30] 503 U.S. 1 (1992).

[31] Rec. Doc. 53 at 18.

[32] *Id.* at 19.

[33] *Id.* at 21.

[34] *Id.* at 22–24.

supervisor.[35] The government also contends that Duffy should be prohibited from offering legal conclusions or purporting to instruct the jury on the law.[36]

Fourth, the government argues that Duffy should be prohibited from making unreliable and unsupported "Force Science" claims or offering psychological or psychiatric testimony.[37] Additionally, the government asserts that Duffy should be prohibited from asserting that Victim 1 exhibited scientifically validated "pre-assault indicators" or that an officer's suspicion of imminent assault is 95% reliable.[38] The government also argues that Duffy should be prohibited from opining that the OIG investigation was compromised by investigators' review of video footage.[39]

## B.   *Firmin's Arguments in Opposition to the Motion*

In response, Firmin begins by acknowledging that he will not elicit testimony from Duffy regarding: (1) Firmin's intent; (2) the severity of Victim 1's injuries; (3) "Force Science" claims; (4) psychological or psychiatric issues; (5) scientifically validated "pre-assault indicators"; (6) the reliability of an officer's suspicion of imminent assault; or (7) the Office of the Inspector General's investigation.[40] Furthermore, Firmin states he will not ask Duffy questions designed to elicit legal conclusions or to instruct the jury on the law.[41] Therefore, Firmin suggests that the only issues before the Court are limited to: (1) whether Duffy is qualified to testify as a law enforcement use of force expert; (2) whether Duffy's proposed testimony as to Firmin's perception of threat and

---

[35] *Id.* at 24–25.

[36] *Id.* at 25–26.

[37] *Id.* at 26–29.

[38] *Id.* at 29–31.

[39] *Id.* at 31–33.

[40] Rec. Doc. 62 at 5.

[41] *Id.*

subsequent use of force are reliable and relevant to material issues in this case; and (3) whether Duffy's proposed testimony concerning Firmin's use of force is admissible under Federal Rule of Evidence 403.[42]

Firmin asserts that Duffy is qualified to testify as a law enforcement use of force expert.[43] Firmin asserts that the expert report extensively details Duffy's pertinent training and experience, and he is qualified to testify on these issues.[44]

According to Firmin, Duffy's proposed testimony as to Firmin's perception of threat and subsequent use of force satisfies the reliability prong of the admissibility analysis.[45] Firmin suggests that Duffy relied on his extensive experience and specialized knowledge to consider the totality of the circumstances involving Firmin's use of force.[46] According to Firmin, Duffy evaluated Firmin's actions in relation to applicable USMS policies, the Federal Law Enforcement Training Center Use of Force Instructor Training Program curriculum, and the International Association of Chiefs of Police ("IACP") policies.[47] Firmin points out that Duffy explains the basis for his opinion regarding use of force by evaluating Firmin's use of "open hand techniques" against USMS and IACP definitions of "less-than-lethal force."[48] Firmin asserts that Duffy assessed the conduct in accordance with de-escalation protocols recognized in law enforcement.[49] According

---

[42] *Id.* at 5–6.

[43] *Id.* at 8.

[44] *Id.*

[45] *Id.* at 9–10.

[46] *Id.* at 10.

[47] *Id.*

[48] *Id.*

[49] *Id.*

to Firmin, this demonstrates that Duffy's proposed testimony is based on his specialized knowledge and supported by accepted law enforcement standards.[50]

Firmin asserts that Duffy is not required to resolve conflicting evidence or make credibility determinations for his testimony to be considered reliable.[51] Rather, Firmin suggests the proper mechanism to probe any alleged weaknesses in the basis of his testimony is vigorous cross-examination and the presentation of contrary evidence.[52] Moreover, Firmin contends that an expert may rely on hypothetical facts that are supported by the evidence.[53] Firmin points out that the government primarily takes issue with Duffy's assumption that Firmin knew of the nature of Victim 1's threats, contending any evidence thereof stems from an unsworn, out-of-court statement of a transport officer.[54] Firmin asserts that his narrative report within the USMS Field Operational Report, which forms the basis for Count 2, contains the same information on which Duffy relied in forming his opinion.[55]

Firmin submits that Duffy's proposed testimony is relevant because it will help the trier of fact understand the evidence to determine whether Firmin could reasonably have deemed the subject use of force necessary to maintain or restore discipline.[56] Absent the training and experience, Firmin submits a lay juror is deprived of the necessary context to evaluate an officer's

---

[50] *Id.*

[51] *Id.* at 11.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at 12.

perception of, and response to, the behavior and conduct of a federal prisoner.[57] Firmin asserts that law enforcement practices, including threat assessment and use of force in a detention facility, are the proper subject of expert testimony because they assist the trier of fact in understanding conduct that is not within common experience.[58]

Firmin argues that Rule 403 does not require exclusion of Duffy's proposed testimony regarding Firmin's use of force because *Hudson* requires a proportionality evaluation.[59] Firmin asserts that the relationship between the need for the application of force and the amount of force used is the very issue Duffy's specialized knowledge will help the jury understand.[60]

Finally, Firmin asserts precluding Duffy's testimony would deprive Firmin of his constitutional right to a meaningful opportunity to present a complete defense.[61] Firmin asserts that the central issue at trial will be whether he acted in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.[62] He asserts that this inquiry necessarily turns on the threat reasonably perceived by the officer and the proportionality of the response.[63] He contends that Duffy's testimony goes directly to these constitutionally mandated factors.[64] He submits that exclusion of Duffy's testimony would strip the defense of the only meaningful way

---

[57] *Id.* at 13.

[58] *Id.*

[59] *Id.* at 14.

[60] *Id.*

[61] *Id.* at 15.

[62] *Id.*

[63] *Id.*

[64] *Id.*

of presenting his theory that his conduct was objectively reasonable and undertaken in good-faith.[65]

### C.    *The Government's Arguments in Further Support of the Motion*

The government makes four arguments in the reply brief.[66] First, the government asserts Duffy's specialized knowledge of the training and policies of the USMS prior to 2019 does not qualify him to render the opinions in his report.[67] Because Duffy's employment with the USMS ended five years before the events at issue in the Indictment, the government does not believe that Duffy is qualified to offer expert testimony on the training and policy standards that apply to this case.[68]

Second, the government contends that Firmin still fails to identify a reliable method underlying Duffy's analysis.[69] The government suggests that Firmin incorrectly collapses the distinct issues of qualification and reliability by asserting that Duffy's methodology is reliable because it is based on his specialized knowledge, training, experience, and first-hand observation.[70] The government argues that the most significant flaw in Duffy's methodology is his failure to identify the standards of conduct to which he purports to compare Firmin's behavior.[71] Additionally, the government points out that Firmin does not address the government's argument that Duffy performed his analysis from the perspective of an omniscient third party, analyzed facts

---

[65] *Id.* at 16.

[66] Rec. Doc. 69.

[67] *Id.* at 2.

[68] *Id.*

[69] *Id.* at 3.

[70] *Id.*

[71] *Id.* at 4.

without reference to their temporal relevance, and failed to distinguish between assumed or hypothesized facts and his own credibility determinations.[72]

Third, the government argues that Firmin's opposition largely defends materially different opinions than Duffy actually rendered.[73] The government points out that the opposition suggests that Duffy opined that Firmin *perceived* Victim 1 to pose a threat, but rather the report states that Victim 1 *did* pose a threat at the time of the charged incident.[74] The government agrees that Firmin's *subjective* perception of threat is the central issue for trial, but it asserts that the *objective* existence of a threat is the subject of Duffy's report.[75] Even if Duffy had opined that Firmin subjectively perceived a threat, the government argues that opinion would be inadmissible under Rule 704(b), because it would amount to an opinion that Firmin used force in good faith.[76] The government does not dispute that there are circumstances in which a jury may need expert assistance in assessing whether and why a law enforcement officer might perceive danger, but the government submits this is not such a case.[77] The government points out that Duffy did not discuss or identify any "circumstance unique to law enforcement" or any specialized law enforcement tactic, custom, or training that the jury will need to understand to analyze the facts presented here.[78]

The government also reiterates that Duffy did not perform a proportionality analysis under *Hudson* and his opinion that Firmin used reasonable force is likely to confuse the issues, as the

---

[72] *Id.* at 6–7.

[73] *Id.* at 7.

[74] *Id.* at 7–8.

[75] *Id.* at 8.

[76] *Id.*

[77] *Id.* at 9.

[78] *Id.*

11

reasonableness standard from Fourth and Fourteenth Amendment contexts does not apply to this case.[79] The government contends that the difference between proportionality under *Hudson* and "reasonableness" in arrest and pretrial detention cases is not semantic or purely academic.[80] This is because in reasonableness cases, whether force was used in good or bad faith has no bearing on whether it falls within the range of actions that a hypothetical reasonable officer might have taken when confronted with the same facts.[81] In an Eighth Amendment case, force may fall within that range of reasonableness and still violate the Eighth Amendment because it was used maliciously.[82] Therefore, the government argues that Duffy's "reasonableness" opinion is confusing and unhelpful because it completely ignores that distinction.[83]

Finally, the government asserts that Firmin's right to present a defense does not entitle him to present expert testimony that does not satisfy the *Daubert* and Rule 702 standards.[84] The government contends that both the Fifth Circuit and the Supreme Court have made clear that the right to present a complete defense "is not without limits," because "the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."[85]

---

[79] *Id.* at 11.

[80] *Id.* at 13.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.* at 13–14.

[85] *Id.* at 14 (quoting *United States v. Najera Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010); *Taylor v. Illinois*, 484 U.S. 400, 409 (1988)).

### III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[86] Rule 702 states that a witness "qualified as an expert by knowledge, skill, experience, training, or education," may provide expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[87] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony must be based upon sufficient facts or data,

(2) the testimony must be the product of reliable principles and methods, and

(3) the expert must reliably apply the principles and methods to the facts of the case.[88]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[89] The court's gatekeeping function mostly involves a two-part inquiry.

First, the court must determine whether the expert testimony is reliable, which requires an assessment of whether the expert testimony's underlying reasoning or methodology is valid.[90] The

---

[86] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[87] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[88] Fed. R. Evid. 702.

[89] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[90] *See Daubert*, 509 U.S. at 589. The party offering the testimony has the burden to establish reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

13

court's inquiry into the reliability of expert testimony is flexible and fact-specific.[91] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[92] In analyzing reliability, *Daubert* instructs courts to consider (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[93]

Second, the court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact in understanding the evidence.[94] The second inquiry primarily analyzes whether the expert testimony is relevant.[95]

Yet a court's role as a gatekeeper does not replace the traditional adversary system.[96] A "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[97] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[98] "As a general rule, questions relating to the bases and sources

---

[91] *Seatrax*, 200 F.3d at 372.

[92] *See Daubert*, 509 U.S. at 590.

[93] *Id.* at 592–94. In *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert's* list of specific factors does not necessarily nor exclusively apply to every expert in every case. *Kumho Tire*, 526 U.S. at 141. The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[94] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[95] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[96] *See Daubert*, 509 U.S. at 596.

[97] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[98] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

14

of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[99]

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."[100] "The rule was enacted to change the old view that [] giving an opinion on an ultimate issue would 'usurp the function' or 'invade the province' of the jury."[101] The rule, however, "does not open the door to all opinions."[102] Witnesses may not "tell the jury what result to reach," nor may they "give legal conclusions."[103]  The Fifth Circuit has explained that "the task of separating impermissible question which call for overbroad or legal responses from permissible questions is not a facile one," but one that requires courts to exclude questions or answers from experts that "would supply the jury with no information other than the expert's view of how its verdict should read."[104] Moreover, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."[105]

### IV. Analysis

Duffy offers two main opinions in his expert report: (1) Victim 1 "posed an imminent physical threat" to Firmin and others at the time of the alleged offense; and (2) Firmin "utilized reasonable force in removing [Victim 1] from the original cell to another in response to [Victim

---

[99] *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir.1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

[100] Fed. R. Evid. 704(a).

[101] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[102] *Id.*

[103] *Id.* (citing *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981).

[104] *Id.*

[105] Fed. R. Evid. 704(b).

1]'s threats."[106] The government's motion raises numerous objections to Duffy's qualifications, the methodology he employs, and the relevancy of his opinions.[107] In response to the motion, Firmin agreed not to question Duffy on several of the issues raised in the government's motion.[108] Therefore, the Court's analysis is limited to whether Duffy is qualified to offer the two main opinions and whether the opinions are based on reliable methodology.

## A.    *Whether Duffy is Qualified to Render These Opinions*

As an initial matter, the government asserts that Duffy may not be qualified to testify as a use of force expert. Firmin responds that Duffy is more than qualified based on his experience working for the USMS.

An expert "need only possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of [his or her] testimony."[109] "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[110] Nevertheless, district courts function as gatekeepers under *Daubert*, and they "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[111] Moreover, a district court clearly abuses

---

[106] Rec. Doc. 53-1 at 9, 12.

[107] Rec. Doc. 53.

[108] Firmin acknowledges that he will not elicit testimony from Duffy regarding: (1) Firmin's intent; (2) the severity of Victim 1's injuries; (3) "Force Science" claims; (4) psychological or psychiatric issues; (5) scientifically validated "pre-assault indicators"; (6) the reliability of an officer's suspicion of imminent assault; or (7) the Office of the Inspector General's investigation. Rec. Doc. 62 at 5. Firmin also states he will not ask Duffy questions designed to elicit legal conclusions or to instruct the jury on the law. *Id.*

[109] *See, e.g.*, *Thomas v. Chambers*, No. CV 18-4373, 2019 WL 8888169, at *12 (E.D. La. Apr. 26, 2019) (Vance, J.).

[110] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

[111] *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702).

its discretion if it fails to "perform its gatekeeping function by performing some type of *Daubert* inquiry and by making findings about the witness's qualifications to give expert testimony."[112]

Duffy's report states that he served with the USMS for 24 years, retiring as a Senior Inspector in March 2019.[113] Prior to his retirement, Duffy was assigned to the Office of Professional Responsibility as an Internal Affairs Investigator and to various positions with the Training Division.[114] After his retirement, Duffy served as a District Security Officer, a contract position with the USMS, in the Southern District of Georgia and Northern District of Florida for six years.[115] Duffy holds several instructor certifications from the Federal Law Enforcement Training Center and has completed the Force Science Institute's forensic science training and exam requirements.[116] Considering this experience, the Court finds that Duffy is qualified to testify as an expert on use of force.

The government suggests that Duffy is not qualified to offer expert testimony on the training and policy standards that apply to this case because Duffy's employment with the USMS ended five years before the events at issue in the Indictment.[117] However, the government does not provide any argument on how training or policy standards have changed in the five years after Duffy's retirement. Moreover, Duffy continued working in a contract position with the USMS for six years after his retirement. Firmin has also agreed to withdraw any opinions about psychological

---

[112] *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016) (internal citations omitted).

[113] Rec. Doc. 53-1 at 3.

[114] *Id.*

[115] *Id.* at 4.

[116] *Id.*

[117] Rec. Doc. 69 at 2.

or psychiatric issues, opinions on which scientific qualifications would likely be necessary. Therefore, Duffy does appear qualified to testify on USMS policies and procedures.

Nevertheless, because Duffy uses a reasonable force standard applicable to Fourth Amendment cases, rather than the *Hudson* factors applicable to Eighth Amendment cases, it is not clear whether he is qualified to offer Opinion 2. For this reason, some of the proposed testimony appears to be outside the area of Duffy's expertise, and Firmin has not established that Duffy is qualified to testify regarding Opinion 2.

### B. *Whether Duffy's Opinions are Reliable*

The government argues that Duffy's opinions are unreliable, unhelpful, and inadmissible. The Court addresses each of the two opinions offered in turn.

### 1. Opinion 1: Victim 1 Posed an Imminent Physical Threat to Firmin

Duffy opines that Victim 1 posed an imminent physical threat to Firmin and others on the date of the incident.[118] Duffy bases this opinion on discovery showing that two law enforcement officers warned Firmin of Victim 1's intention to "spit and use force" against Firmin.[119] "With the warnings in mind," Duffy opines that "Firmin expected to be assaulted in the cellblock by [Victim 1]. At a minimum, [] Firmin expected to be a target of spitting which constitutes an assault on a law enforcement officer."[120] Duffy also states that Victim 1's aggression was not limited to Firmin, as Victim 1 told his attorney that if "they tried to give me more time, guess what, I'm going to cut

---

[118] Rec. Doc. 53-1 at 9.

[119] *Id.*

[120] *Id.* at 10.

up in the courtroom. I'm not worried about nothing. Have to fight with me . . . You're going to have to fight with me."[121]

Duffy also reviewed the video from the holding cell, which he asserts highlights Victim 1's "agitation, demeanor, and intent to induce harm on [] Firmin."[122] Duffy asserts that the video shows: (1) Victim 1 was visibly agitated as evidenced by his constant pacing and gesturing; (2) the other inmate in the holding cell demonstrates "a method of defeating handcuffs"; (3) during that time period, Victim 1 "spends an inordinate amount of time, roughly two and a half minutes, standing behind the latrine half wall, obscuring himself from camera view."[123]

Duffy opines that "Firmin, made aware of [Victim 1's] pre-assault indicators, determined he was going to move [Victim 1] to another cell to talk to him."[124] Although Victim 1 is obscured from view at that portion of the video, Duffy opined that when Firmin opened the cell door Victim 1 "attempt[ed] to spit on" Firmin.[125] Duffy represents that Firmin then placed Victim 1 against the wall, waiting for the other deputy Marshal to lock the door.[126] Duffy states that Firmin and the other deputy, then used "open hand techniques to escort [Victim 1] to another cell, at which time Firmin pushes [Victim 1] into the cell creating a reactionary gap. . . . A reactionary gap is the distance between you and a potential threat that allows you time to react if the situation

---

[121] *Id.* at 11.

[122] *Id.*

[123] *Id.*

[124] *Id.* Firmin acknowledged that he will not elicit testimony from Duffy regarding scientifically validated "pre-assault indicators."

[125] *Id.*

[126] *Id.*

escalates."[127] Duffy opines this is a fundamental concept in personal safety and law enforcement training.[128]

As an initial matter, to the extent Firmin seeks to elicit testimony from Duffy that these policies would have been on Firmin's mind when taking the actions regarding Victim 1, Duffy cannot testify to Firmin's intent or state of mind,[129] nor can he testify regarding what a "reasonable officer" would do as the reasonable force standard is not applicable to Eighth Amendment cases.[130] Firmin does not have to testify as to what was on his mind. In fact, he has a right not testify at all. Nevertheless, he cannot hire an expert to testify to what his thoughts or motivations were. Accordingly, Duffy cannot express an opinion to the jury that Firmin perceived Victim 1 to pose a threat.

### a.    Whether this Opinion Will be Helpful to the Jury

The government argues that this testimony should be excluded because it will not be helpful to the jury, and the facts of this case do not present the kind of specialized technical law enforcement considerations that a jury needs expert help to understand.[131] Firmin argues that expert testimony is necessary to understand this issue because a trained officer's threat perception assessment calls upon the officer's professional understanding of institutional practices, use of

---

[127] *Id.*

[128] *Id.*

[129] Pursuant to Federal Rule of Evidence 704(b), "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."

[130] *See infra* Section b.

[131] Rec. Doc. 53 at 12.

force protocols, and security constraints.[132] However, Firmin acknowledges that he will not elicit testimony from Duffy regarding scientifically validated "pre-assault indicators."[133]

Expert testimony is admissible only if it will assist the trier of fact to understand the evidence or determine a fact in issue.[134] "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[135] Experts "may not form conclusions for a jury that they are competent to reach on their own."[136]

The government and the defense do not dispute the basic facts at issue. Firmin heard from colleagues that Victim 1 had made a verbal threat to spit on or assault him. Firmin went to the holding cell where Victim 1 was restrained in handcuffs and shackles. Firmin then pulled Victim 1 out of the cell. The government expects to prove that the force Firmin used was motivated by desire to inflict an extrajudicial punishment on Victim 1 for having verbally challenged him.[137] Duffy's report suggests that Firmin merely intended to move Victim 1 to another cell so that he could speak with him.

---

[132] Rec. Doc. 62 at 12–13.

[133] *Id.* at 5.

[134] Fed. R. Evid. 702.

[135] *Vogler v. Blackmore*, 352 F.3d 150, 156 n. 5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 Advisory Committee Note).

[136] *United States v. Haines*, 803 F.3d 713, 733 (5th Cir. 2015) (quoting *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013)).

[137] Rec. Doc. 53 at 12.

Duffy's opinion that Victim 1 posed a threat to Firmin does not assist the jury in resolving these competing accounts. The issue of whether Firmin sincerely perceived a threat to his own safety or the security of the detention facility upon learning of the verbal threat and what motivated his actions upon his opening the cell door is a question for the jury to resolve. If the threat was spitting, what regulations or protocols do the marshals employ to protect themselves and others from spitting (*i.e.*, a spitting mask)? Perhaps specialized knowledge of law enforcement custom or training would assist the jury in understanding these types of issues if a particular protocol for spitting inmates was used here. However, Duffy does not offer any. Instead, he interjects his own subjective beliefs and conclusions.

The parties both rely on *United States v. Brown*,[138] a Seventh Circuit opinion addressing the propriety of expert testimony on law enforcement use-of-force. The court recognized that "[t]he level of factual complexity in the case may also bear on the relevance of expert testimony about police practices or protocols."[139] "In many cases evaluating an officer's conduct will draw primarily on the jury's collective common sense."[140] Nevertheless, the court recognized that expert testimony "may be relevant in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue."[141] The court explained that expert testimony is more likely appropriate in cases involving specialized weapons, tactics, or operational protocols than in cases that involve hands-on physical battery.[142]

---

[138] 871 F.3d 532 (7th Cir. 2017).

[139] *Id.* at 538.

[140] *Id.*

[141] *Id.* at 537.

[142] *Id.* at 538 ("The jury's common experience will suffice, for example, when police use[ ] their bare hands in making an arrest, the most primitive form of force. But when something peculiar about law enforcement (e.g., the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact, a juror's everyday experience may not be enough to effectively assess reasonableness. If a case involves a gun, a slapjack, mace, or some

Because the misconduct alleged in *Brown* involved the police officer punching and kicking an individual, the Seventh Circuit reasoned that the case provided "a textbook example of easily comprehensible facts," and therefore the trial court did not abuse its discretion in excluding the expert.[143]

Firmin has not identified any facts or circumstances in this case that require specialized knowledge to evaluate. He suggests that Duffy's testimony will assist the jury in understanding institutional practices, use of force protocols, and security constraint, but the discussion section accompanying Opinion 1 does not even address these topics. Duffy's report does not discuss or identify any specialized law enforcement tactic, custom, or training that the jury will need to understand to analyze the facts actually present in this case. Similar to *Brown*, this case involves a US Marshal grabbing an inmate from a cell, what appears to be him throwing the inmate against a wall, and then shoving the inmate into another cell. This is "a textbook example of easily comprehensible facts."[144]

Duffy devotes only two paragraphs to issues that could arguably be described as specialized law enforcement knowledge or insight. First, Duffy opines that a particular sequence of wrist and hand movements by Victim 1's cellmate resemble a known method of defeating handcuffs. This case does not involve an assault on the cellmate, and Duffy does not explain how this observation is relevant to evaluating the threat posed by Victim 1, especially since that behavior ceased long before Firmin entered the cell. Second, Duffy opines that Firmin created a "reactionary gap" when he pushed Victim 1 into the cell. It is a matter of common sense that pushing a person is not

---

other tool, . . . the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do?") (cleaned up).

[143] *Id.* at 538–39.

[144] *Brown*, 871 F.3d at 538–39.

necessary to create a gap. Moreover, Duffy does not explain how Firmin's creation of a reactionary gap is relevant to his opinion that Victim 1 posed a threat to Firmin.

The facts in issue are easily within the grasp of a lay jury. The proposed testimony is unhelpful because the facts of this case do not present any question or circumstance bearing upon physical threat that cannot be adequately assessed using layman's common sense and everyday experience.

### b.    Whether the Methodology is Reliable

The government argues that Duffy's opinion on whether Victim 1 posed a threat to Firmin is not based on a reliable expert methodology.[145] The government argues that Duffy's analysis is unreliable because he does not identify the controlling legal standard or confine the analysis "to the facts that could logically be probative of [] Firmin's state of mind during his use of force against Victim 1."[146]

Firmin suggests that Duffy's opinion is sound because it was based on his training and experience in use of force protocols.[147] This argument collapses the distinct issues of Duffy's qualifications and the reliability of his methodology. As the Fifth Circuit has recognized in an excessive force case, expert testimony should be excluded when it "offers little more than personal assurances based on his police experience that his conclusions are so . . . both on the basis of insufficient factual support and lack of reliable methodology."[148] Testimony from a qualified

---

[145] Rec. Doc. 53 at 14.

[146] *Id.* at 15. The government relies on a book titled Evaluating Police Uses of Force to support the assertion that "[e]stablished methodologies in law enforcement and correctional contexts require assessment of threat, proportionality, and intent based on contemporaneous perception, not retrospective compilation."

[147] Rec. Doc. 62 at 9–10.

[148] *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

expert may nevertheless be unreliable if not based on a sound methodology.[149] Therefore, to be considered reliable, Duffy's opinions must be based on more than his training and experience.

The government relies on a book titled *Evaluating Police Uses of Force* to support the assertion that "[e]stablished methodologies in law enforcement and correctional contexts require assessment of threat, proportionality, and intent based on contemporaneous perception, not retrospective compilation."[150] However, the government has not attached any excerpts from the book as an exhibit to the instant motion. Therefore, the Court cannot evaluate the veracity of this assertion. Instead, the Court looks to the caselaw setting forth the standard on whether use of force against a prisoner serving a sentence violates the on Eighth Amendment.

Count 1 charges Firmin with a willful violation of the Eighth Amendment right of a prisoner[151] to be free from cruel and unusual punishment. The right is violated when a government official uses force against a prisoner in bad faith, for the malicious or sadistic purpose of inflicting nonjudicial punishment, rather than in a good-faith effort to further the legitimate security interests of a penal institution.[152] Though "[t]he focus of this standard is on the detention facility official's subjective intent to punish, intent is determined by reference to the well-known *Hudson* factors— the extent of injury suffered, the need for application of force, the relationship between that need

---

[149] *Viterbo*, 826 F.2d at 424 ("[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

[150] Rec. Doc. 53 at 15.

[151] A prisoner is a person in the physical custody of the government pursuant to a judicially imposed criminal sentence, as opposed to a pretrial detainee.

[152] *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citing *Hudson*, 503 U.S. at 7) (explaining *Hudson* and holding that the "core judicial inquiry" was "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm").

and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."[153]

Under the *Hudson* factors, one focus of the jury's inquiry will be whether there was a threat reasonably perceived by Firmin. The Court agrees with the government that Duffy's analysis that Victim 1 posed an "imminent physical threat" to Firmin and others employs an improper methodology because it is based on facts that were not known to Firmin at the time of the incident. For example, Duffy cites the transport officer's statement that Victim 1 told her as many as 10 times that he planned to spit on Firmin.[154] However, the transport officer's statement makes clear that she did not see or speak with Firmin face to face before the use of force occurred. Instead, she sent him two text messages, which said only "Watch out for [Victim 1]… for some reason he really don't like you. Just wanted to make sure." Duffy does not cite any evidence to suggest that the transport officer ever relayed the number and nature of the threats to Firmin.

Duffy also states that Victim 1's aggression was not limited to Firmin, as Victim 1 told his attorney that if "they tried to give me more time, guess what, I'm going to cut up in the courtroom. I'm not worried about nothing. Have to fight with me . . . You're going to have to fight with me."[155] However, Duffy omits context from the statement, which shows that Victim 1 made this statement to his attorney *after* the encounter with Firmin.[156] Therefore, this statement could not logically support Duffy's conclusion that Victim 1 posed an imminent threat to Firmin and others at the time of the alleged attack in the cellblock. Because Duffy failed to limit the analysis to information

---

[153] *Cowart v. Erwin*, 837 F.3d 444, 452–53 (5th Cir. 2016) (internal citations and quotation marks omitted).

[154] Rec. Doc. 53-1 at 10.

[155] *Id.* at 11.

[156] *See* Rec. Doc. 53-2 at 30–31 ("I told my lawyer and my head was busted too. [Lawyer's name]. Man, they tried to give me more time, guess what, I'm going to cut up in the courtroom. I'm not worried about nothing. Have to fight with me. My head already f**ed up as it is. You're going to have to fight with me.").

that could have been known to Firmin at the time of the alleged attack, the Court finds that Opinion 1 is not based on reliable methodology.

Firmin asserts that Duffy is not required to resolve conflicting evidence or make credibility determinations for his testimony to be considered reliable.[157] The "facts and data" language in Rule 702 is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence.[158] When a party introduces sufficient evidence at trial to support their version of the facts, the party may then ask the expert to testify as to an opinion assuming those facts are true.[159] This argument does not negate the issues with Duffy's methodology and the fact that he did not limit his analysis to information that could have been known to Firmin at the time of the alleged attack. Therefore, the Court finds this argument by Firmin unpersuasive.

> **2.      Opinion 2: Firmin Utilized Reasonable Force in Removing Victim 1 from the Original Cell to Another in Response to Victim 1's Threats**

Duffy opines that Firmin "utilized reasonable force in removing [Victim 1] from the original cell to another in response to [Victim 1]'s threats."[160] Duffy bases this opinion on statements by Firmin and other deputy marshals that Firmin wanted to move Victim 1 into another cell to talk to him. Duffy asserts that "Firmin engaged [Victim 1] with open hand techniques, considered the least intrusive Less-Than-Lethal option."[161] He provides definitions of less than lethal force from USMS and International Association of Chiefs of Police ("IACP") policies.

---

[157] Rec. Doc. 62 at 11. Firmin also argues that it is premature to exclude portions of Duffy's testimony that rely on hearsay statements because the Court has not ruled on whether those statements are admissible. *Id.* at 12. The Court need not reach this issue, as this ruling is not based on Duffy's reliance on hearsay statements.

[158] *Joseph v. Doe*, No. CV 17-5051, 2021 WL 2313475, at *5 (E.D. La. June 7, 2021).

[159] *Id.*

[160] Rec. Doc. 53-1 at 12.

[161] *Id.*

Duffy opines that "Firmin's actions correspond with legal decisions that establish that officers may proactively use force to respond to impending harm."[162] Duffy opines that "Firmin successfully de-escalated the situation by confronting the threat posed by [Victim 1] and isolating him in his own cell."[163] To support this opinion, Duffy points to information showing that Firmin and Victim 1 had a lengthy conversation following the altercation and Victim 1 told others that Firmin was "alright."[164]

The government argues that Opinion 2 is not the product of accepted and reliable analytical methods because Duffy did not follow the *Hudson* framework for analyzing whether use of force against a convicted prisoner serving a sentence violates the Eighth Amendment.[165] Firmin responds that Duffy's testimony is admissible because *Hudson* requires a proportionality evaluation, and "the relationship between the need for the application of force and *the amount of force used* is the very issue on which [] Duffy's specialized knowledge will help the jury understand."[166]

As discussed above, Firmin is charged with a willful violation of the Eighth Amendment right of a prisoner to be free from cruel and unusual punishment. The right is violated when a government official uses force against a prisoner in bad faith, for the malicious or sadistic purpose of inflicting nonjudicial punishment, rather than in a good-faith effort to further the legitimate

---

[162] *Id.* (citing *Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993); *Montoute v. Carr*, 114 F.3d 181 (11th Cir. 1997).

[163] *Id.* at 13. Duffy also opines that "the open hand, Less-Than-Lethal force option . . . did not result in serious physical injury as defined by USMS policy." He states that the injury sustained by Victim 1 "appears to be inadvertent, unintended, and . . . is not considered serious physical injury." However, Firmin agrees not to question Duffy on the extent of Victim 1's injuries.

[164] *Id.* at 13–14.

[165] Rec. Doc. 53 at 18.

[166] Rec. Doc. 62 at 14.

security interests of a penal institution.[167] Though "[t]he focus of this standard is on the detention facility official's subjective intent to punish, intent is determined by reference to the well-known *Hudson* factors—the extent of injury suffered, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."[168]

The *Hudson* factors call for a proportionality assessment of the threat that was reasonably perceived by the government actor and the amount of force used in response.[169] The focus of the inquiry is on the official's subjective intent to punish, and the *Hudson* factors are evaluated to determine intent. [170] The *Hudson* factors are distinguishable from the "objective reasonableness" standard applied under the Fourth Amendment in arrest and pretrial detention cases. The Supreme Court has observed that "[d]iffering standards under the Fourth and Eighth Amendments are hardly surprising: the terms 'cruel' and 'punishments' clearly suggest some inquiry into subjective state of mind, whereas the term 'unreasonable' [searches and seizures] does not."[171] "The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry."[172]

---

[167] *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citing *Hudson*, 503 U.S. at 7)  (explaining *Hudson* and holding that the "core judicial inquiry" was "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm").

[168] *Cowart*, 837 F.3d at 452–53.

[169] In *Hudson*, the Supreme Court explained the proportionality concept stating: "[t]o deny. . . the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the concepts of dignity, civilized standards, humanity, and decency that animate the Eight Amendment." *Hudson*, 503 U.S. at 11.

[170] *Cowart*, 837 F.3d at 452–53.

[171] *Graham v. Connor*, 490 U.S. 386, 398 (1989).

[172] *Id.* at 399.

Duffy's analysis of Firmin's conduct is more akin to a Fourth Amendment objective reasonableness inquiry. Duffy does not identify the *Hudson* standard, discuss any of the *Hudson* factors, or analyze the amount or kind of force used in light of the need for the application of force. In Fourth Amendment cases, whether on officer acted in good or bad faith has no bearing on whether it falls within the range of actions that a reasonable officer might have taken when confronted with the same facts.[173] In Eighth Amendment cases, force may fall within a range of reasonableness and still violate the Eighth Amendment if it is applied "maliciously and sadistically to cause harm," rather than in a good-faith effort to maintain or restore discipline.[174] Duffy's reasonableness opinion is confusing and unhelpful because it ignores the distinction between Fourth and Eighth Amendment cases.

Firmin suggests that Duffy's opinion is reliable because he evaluated Firmin's actions in relation to applicable USMS policies, the Federal Law Enforcement Training Center Use of Force Instructor Training Program curriculum, and the International Association of Chiefs of Police policies.[175] As discussed above, Duffy cited USMS and IACP policies to define "Less-Than-Lethal force" and "serious bodily injury." He suggests that Firmin "utilized reasonable force" by engaging Victim 1 with "open hand techniques," but he does not explain why Firmin's actions qualify as an open hand technique. In the video of the incident, one can see an already injured victim being pushed into a cell. Therefore, the discussion section of the report, which purports to set forth the basis for Opinion 2, does not explain how these policies establish or articulate a standard of conduct for law enforcement.

---

[173] *Id.* at 398.

[174] *Hudson*, 503 U.S. at 6.

[175] Rec. Doc. 62 at 10.

In the "Policy Considerations" section of the report, Duffy cites three USMS policies requiring: (1) at least two cellblock personnel be present when cells are unlocked or entered; (2) separation of prisoners not participating in a disturbance; and (3) "use of less-than-lethal force only in situations where reasonable force, based on the totality of the circumstances at the time of the incident is necessary to protect [USMS personnel] or others from physical harm."[176] Duffy concludes that Firmin complied with these policies.[177] As discussed above, the *Hudson* factors are the governing legal standard applicable to this case. The USMS policies reference reasonable force. However, the words "reasonable force" do not appear in the *Hudson* factors, and they do not appear in either party's proposed jury instructions.[178] Consequently, Duffy's opinion will only serve to confuse the jury by applying an erroneous standard.

During the hearing on this motion, the government did not dispute that USMS policies would be admissible and could be offered through a fact witness. The defense responded that Firmin has a right to remain silent and so he needs an expert to testify to the USMS policies and his compliance with such policies. Although Firmin has an unequivocal right to remain silent, it would be inappropriate to allow an expert witness to testify to Firmin's state of mind. It is for the jury to decide the issue of whether Firmin was attempting to comply with these policies in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Pursuant to Federal Rule of Evidence 704(b), "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."

---

[176] Rec. Doc. 53-1 at 14.

[177] *Id.*

[178] Rec. Docs. 44, 46.

Firmin can call other fact witnesses, such as his supervisors at the USMS, to testify on policies and training Firmin received. Firmin has not established that expert witness testimony is necessary to show what USMS policies were, and it would be a violation of Rule 704(b) to allow Duffy to testify to Firmin's state of mind.

For the reasons discussed above, the Court finds that Opinion 2 is not the product of accepted and reliable analytical methods. Under Federal Rule of Evidence 403, a court may exclude relevant evidence if its probative value is substantially outweighed by the danger of confusing the issues or misleading the jury. Opinion 2 is of very little probative value. There is a strong possibility that if the jury hears expert testimony about "reasonable force" it will erroneously believe that "reasonable force" is the governing legal standard. Therefore, any limited probative value of Opinion 2 on use of reasonable force is substantially outweighed by a danger of confusing the issues and misleading the jury.

## C.   *Whether Excluding Duffy's Testimony Would Deprive Firmin of his Constitutional Right to Present a Defense*

Finally, Firmin asserts precluding Duffy's testimony would deprive Firmin of his constitutional right to a meaningful opportunity to present a complete defense.[179] The Fifth Circuit and the Supreme Court have made clear that the right to present a complete defense "is not without limits [because] 'the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'"[180] "[R]ules

---

[179] Rec. Doc. 62 at 15.

[180] *United States v. Najera Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010) (quoting *Taylor v. Illinois*, 484 U.S. 400, 409 (1988)).

excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve."[181]

Firmin argues that exclusion of the proffered expert testimony would deprive him of the right to present a complete defense because the testimony is "reliable, relevant, and essential to the defense."[182] As the proponent of Duffy's expert testimony, Firmin has failed to meet his burden of showing that Duffy is qualified to offer these opinions or that the opinions are based on sound methodology. However, if Duffy is able to provide fact testimony that is within his own personal knowledge about relevant and identifiable U.S. Marshals Service practices and procedures, he may be able to testify as a fact witness.

## V. Conclusion

For the reasons discussed above, the Court excludes Duffy's proposed testimony. With respect to Opinion 2, Duffy may not be qualified to testify as an expert on Eighth Amendment violations. With respect to Opinion 1, Duffy's methodology is unreliable, and his proposed testimony is unhelpful to the jury as it is a matter of common sense. With respect to Opinion 2, Duffy's methodology is again unreliable. Additionally, the very limited probative value of Opinion 2 is substantially outweighed by a danger of confusing and misleading the jury. However, Duffy may be able to testify as a fact witness. Accordingly,

---

[181] *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

[182] Rec. Doc. 62 at 16.

**IT IS HEREBY ORDERED** that the government's Motion to Exclude Proposed Expert Testimony of Mr. Paul Duffy[183] is **GRANTED**.

**NEW ORLEANS, LOUISIANA**, this 12th day of April, 2026.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[183] Rec. Doc. 53.